No. 21-3013

## UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

STATES OF MISSOURI, ALASKA, ARIZONA, ARKANSAS, INDIANA, KANSAS, MONTANA, NEBRASKA, OHIO, OKLAHOMA, SOUTH CAROLINA, TENNESSEE, UTAH,

*Plaintiffs-Appellants*,

v.

JOSEPH R. BIDEN, JR., ET AL.

*Defendants-Appellees*.

Appeal from the United States District Court for the Eastern District of Missouri, The Honorable Audrey G. Fleissig

## BRIEF OF APPELLANTS

Office of the Missouri Attorney General
Supreme Court Building
P.O. Box 899
Jefferson City, Missouri 65102
Phone: 573-751-8870
Fax: 573-751-0774
John.Sauer@ago.mo.gov

**ERIC S. SCHMITT**
*Attorney General*

D. John Sauer, MO 58721
*Solicitor General*
Jeff P. Johnson, MO 73249
*Deputy Solicitor General*

*Attorneys for Plaintiffs-Appellants*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

On January 20, 2021, the President created an "Interagency Working Group" to promulgate "social costs of greenhouse gases" that federal agencies "shall" use to monetize the future costs of greenhouse-gas emissions. With respect to the Working Group, the Government concedes that "no statute establishes it, nor delegates in any legislative authority." Yet its calculations are *binding* on federal agencies, as long as no statute prohibits their use. Thus, an agency with no legislative authority purports to dictate to other agencies how they must exercise their delegated legislative authority. This constitutes a clear and manifest violation of the separation of powers. The Working Group also violated the Administrative Procedure Act by refusing to provide notice-and-comment on its cost calculations.

The Working Group's values place not just a thumb, but a hundredweight on the scales of future agency rulemakings. They require agencies to monetize costs of greenhouse-gas emissions based on speculative projections that purport to predict the arc of human history for the next 300 years. They assert hundreds of billions of dollars in "social costs" per year to justify an enormous expansion of federal regulatory authority. Yet the district court held that thirteen States lacked standing because it thought they faced no likely injuries from this massive, unconstitutional expansion of federal regulatory power. These are questions of great importance, and Appellants respectfully request oral argument of 20 minutes per side.

i

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ........... i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES .............................................................. iv

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES.........................................................2

STATEMENT OF THE CASE.............................................................4

    A. Executive Order 13990 Creates an Interagency Working Group to Dictate Binding Values for the "Social Costs of Greenhouse Gases." .............................4

    B. The Working Group Promulgates Binding Interim Values for the "Social Costs" of Carbon Dioxide, Methane, and Nitrous Oxide. ...................................6

    C. The Impact of the Working Group's Interim Values. ....................................9

    D. Procedural History. ...........................................................11

    E. Use of Interim Values in Ongoing Rulemakings. .........................................14

SUMMARY OF ARGUMENT ........................................................15

ARGUMENT ..................................................................................18

    I. The District Court Erred in Dismissing the Complaint for Lack of Standing and Ripeness. ................................................18

    A. The Interim Values Purport To Be Binding on Federal Agencies. ...............18

    B. Plaintiffs Have Standing Based on Injuries That Do Not Flow From Future Regulations. .....................................................20

        1. EO 13990 inflicts sovereign injury on the States by commanding and commandeering state agencies on how to administer cooperative-federalism programs. .............................................21

        2. The Working Group injured the States by denying the opportunity to participate in notice-and-comment regarding the Interim Values. .................................................23

    C. Plaintiffs Also Have Standing Based on the Interim Values' Use in Other Agencies' Actions...........................................30

    D. The District Court Erred in Holding Plaintiffs' Claims Unripe. ...................42

Appellate Case: 21-3013    Page: 3    Date Filed: 12/03/2021 Entry ID: 5104488

      1.      Plaintiffs' claims are plainly "fit" for review.......................................43

      2.      Delaying resolution inflicts hardship on the States.............................45

II. The Court Should Remand With Instructions to Enter a Preliminary Injunction. .......................................................................................................47

A. Plaintiffs Are Likely to Succeed on Their Procedural APA Claim..............49

B. Plaintiffs Are Likely to Succeed on Their Separation-of-Powers Claim. .......................................................................................................52

C. The Other Equitable Factors Favor an Injunction.........................................54

CONCLUSION .................................................................................................55

CERTIFICATE OF COMPLIANCE ........................................................................59

CERTIFICATE OF SERVICE ................................................................................59

Appellate Case: 21-3013    Page: 4    Date Filed: 12/03/2021 Entry ID: 5104488

# TABLE OF AUTHORITIES

**Cases**

*Bennett v. Spear*,
   520 U.S. 154 (1997)................................................... 2, 16, 34, 35, 36, 37, 40, 51

*Carson v. Simon*,
   978 F.3d 1051 (8th Cir. 2020) ....................................... 17, 48, 49, 54

*Catholic Health Initiatives v. Sebelius*,
   617 F.3d 490 (D.C. Cir. 2010).............................................. 3, 51, 52

*Center for Biological Diversity v. National Hwy. Traffic Safety Admin.*,
   538 F.3d 1172 (9th Cir. 2008) ..............................................................31

*City of Kennett, Missouri v. EPA*,
   887 F.3d 424 (8th Cir. 2018) ................................... 2, 36, 39, 40, 43, 45

*City of Los Angeles v. Barr*,
   929 F.3d 1163 (9th Cir. 2019) ..............................................................27

*Clapper v. Amnesty International*,
   568 U.S. 398 (2013)..............................................................................39

*Dataphase Sys., Inc. v. C L Sys. Inc.*,
   640 F.2d 109 (8th Cir. 1981) ...............................................................49

*Department of Commerce v. New York*,
   139 S. Ct. 2551, 2565-66 (2019) ......................................... 32, 33, 34

*Hoctor v. U.S. Dep't of Agric.*,
   82 F.3d 165 (7th Cir. 1996) ..................................................................51

*Iowa League of Cities v. EPA*,
   711 F.3d 844 (8th Cir. 2013) ..............2, 18, 19, 24, 25, 27, 28, 37, 42, 43, 44, 45

*KH Outdoor, LLC v. City of Trussville*,
   458 F.3d 1261 (11th Cir. 2006) ...........................................................54

*Kingdomware Technologies, Inc. v. United States*,
   579 U.S. 162, 136 S. Ct. 1969 (2016)..................................................19

iv

*Lujan v. Defenders of Wildlife*,
     504 U.S. 555 (1992) ............................................................... 23, 24, 25

*Lujan v, National Wildlife Federation*,
     497 U.S. 871 (1990) ............................................................................ 41

*Massachusetts v. EPA*,
     549 U.S. 497 (2007) ................................................................. 25, 28, 29

*Meyer v. Bush*,
     981 F.2d 1288 (D.C. Cir. 1993) ........................................................... 50

*Morrison v. Olson*,
     487 U.S. 654 (1988) ......................................................................... 3, 53

*Nat'l Ass'n of Home Builders v. E.P.A.*,
     667 F.3d 6 (D.C. Cir. 2011) ................................................... 25, 40, 41

*Ohio Forestry Association, Inc. v. Sierra Club*,
     523 U.S. 726 (1998) ................................................... 2, 44, 45, 46

*Printz v. United States*,
     521 U.S. 898 (1997) ........................................................................... 23

*Regents of the University of California v. Department of Homeland Security*,
     140 S. Ct. 1891 (2020) ....................................................................... 38

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
     140 S. Ct. 2183 (2020) ....................................................................... 54

*Soucie v. David*,
     448 F.2d 1067 (D.C. Cir. 1971) ..................................................... 3, 49

*Summers v. Earth Island Institute*,
     555 U.S. 488 (2009) ............................................... 2, 26, 27, 38

*Susan B. Anthony List v. Driehaus*,
     573 U.S. 149 (2014) ........................................................................... 33

*Texas v. Biden*,
     10 F.4th 538 (5th Cir. 2021) ....................................................... 28, 29

Appellate Case: 21-3013     Page: 6     Date Filed: 12/03/2021 Entry ID: 5104488

*U.S. ex rel. O'Keefe v. McDonnell Douglas Corp.*,
132 F.3d 1252 (8th Cir. 1998) ...................................................................55

*Usenko v. MEMC LLC*,
926 F.3d 468 (8th Cir. 2019) ...................................................................18

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)...............................................................................3, 53

**Constitutional and Statutory Provisions**

5 U.S.C. § 551(1) .........................................................................................49

5 U.S.C. § 553(b)(A)....................................................................................51

28 U.S.C. § 1291 and § 1292(a)(1)................................................................1

28 U.S.C. §§ 1331, 1346, and 2201(a) ..........................................................1

42 U.S.C. § 7410(a)(1) & (a)(2)(H)(i)..........................................................22

Mo. Rev. Stat. § 643.055 ..............................................................................22

U.S. CONST. art. I, § 1 ..................................................................................53

**Rules**

Fed. R. App. P. 32.........................................................................................59

**Regulations**

40 C.F.R. § 1501.7(b) ..................................................................................21

86 Fed. Reg. 11268 .......................................................................................14

86 Fed. Reg. 27150 .......................................................................................14

86 Fed. Reg. 43737 .......................................................................................15

86 Fed. Reg. 43759 .............................................................................. 14, 15

86 Fed. Reg. 51118–119 (Oct. 5, 2021)........................................................14

Appellate Case: 21-3013    Page: 7    Date Filed: 12/03/2021 Entry ID: 5104488

**Other Authorities**

EO 13990 ...................ii, 2, 4, 6, 10, 11, 12, 13, 18, 19, 21, 22, 27, 29, 31, 37, 46, 52

Appellate Case: 21-3013    Page: 8    Date Filed: 12/03/2021 Entry ID: 5104488

# JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1346, and 2201(a).  JA 26–27, Doc. 6, at 10–11.  On August 31, 2021, the district court dismissed the case for lack of standing and ripeness.  Add. A1; JA 504.  Plaintiffs-Appellants timely filed their notice of appeal on September 1, 2021.  JA 533.  This Court has jurisdiction under 28 U.S.C. § 1291 and § 1292(a)(1).

Appellate Case: 21-3013    Page: 9    Date Filed: 12/03/2021 Entry ID: 5104488

## STATEMENT OF THE ISSUES

I.     Whether the district court erred in holding that the Plaintiff States lacked Article III standing to challenge the promulgation by an "Interagency Working Group"—a creature of Executive Order that possesses no delegated legislative authority—of interim values for the "social costs" of greenhouse gases that, pursuant to Executive Order 13990, are legally binding on federal agencies?

- *Bennett v. Spear*, 520 U.S. 154 (1997)

- *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009)

- *Iowa League of Cities v. EPA*, 711 F.3d 844 (8th Cir. 2013)

- *City of Kennett, Missouri v. EPA*, 887 F.3d 424 (8th Cir. 2018)

II.    Whether the district court erred in holding that Plaintiff States' claims were unripe for adjudication, when the claims raised purely legal issues that are fit for review and the States will suffer hardship in the form of irreparable injury to their sovereign, quasi-sovereign, and proprietary interests from delayed resolution?

- *Iowa League of Cities v. EPA*, 711 F.3d 844 (8th Cir. 2013)

- *City of Kennett, Missouri v. EPA*, 887 F.3d 424 (8th Cir. 2018)

- *Ohio Forestry Association, Inc. v. Sierra Club*, 523 U.S. 726 (1998)

III.   Whether the Court should remand with instructions to enter a preliminary injunction preventing federal agencies from using the Working Group's interim

Appellate Case: 21-3013    Page: 10    Date Filed: 12/03/2021 Entry ID: 5104488

values as binding, when such an injunction would vindicate the separation of powers and prevent a clear violation of the Administrative Procedure Act?

- *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)

- *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting)

- *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971)

- *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490 (D.C. Cir. 2010)

Appellate Case: 21-3013    Page: 11    Date Filed: 12/03/2021 Entry ID: 5104488

## STATEMENT OF THE CASE

**A.     Executive Order 13990 Creates an Interagency Working Group to Dictate Binding Values for the "Social Costs of Greenhouse Gases."**

Carbon dioxide ($CO_2$), methane ($CH_4$), and nitrous oxide ($N_2O$) are common, naturally occurring gases that are ubiquitous by-products of agriculture, transportation, energy production, industrial production, and many other forms of human economic activity. EPA, *Overview of Greenhouse Gases*, at https://www.epa.gov/ghgemissions/overview-greenhouse-gases. These gases are produced by virtually all agricultural, industrial, energy-producing, and transportation activities. *Id.* The authority to regulate greenhouse gas emissions, therefore, is the power to regulate entire foundational sectors of the U.S. economy.

On January 20, 2021, his first day in office, President Biden issued Executive Order 13990, "Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis." JA 69, Doc. 6-1, 86 Fed. Reg. 7037 ("EO 13990" or the "Executive Order"). Section 5 of the Order, "Accounting for the Benefits of Reducing Climate Pollution," instructed all federal agencies to "capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account." JA72, Doc. 6-1, at 5. The "social cost" of greenhouse gases (SCC, SCN, and SCM; collectively "SCGG") are "estimates of the monetized damages associated with incremental increases in greenhouse gas emissions." *Id.*

The Executive Order created an "Interagency Working Group" co-chaired by

4

Appellate Case: 21-3013     Page: 12     Date Filed: 12/03/2021 Entry ID: 5104488

the "Chair of the Council of Economic Advisors, Director of OMB, and Director of the Office of Science and Technology Policy." *Id.* The Working Group includes seven cabinet secretaries and five other high-level executive branch officials. *Id.* Section 5(b)(ii)(A) of the Executive Order directed the Working Group to publish interim social costs for carbon dioxide, methane, and nitrous oxide that federal agencies "***shall*** use when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions until final values are published." JA 72, Doc. 6-1, at 5 (emphasis added). Section 5(b)(ii)(B) directed the Working Group to "publish a final SCC, SCN, and SCM by no later than January 2022," and Section 5(b)(ii)(C)-(E) provided that the Working Group shall provide recommendations regarding the use, updating, and methodology of those numbers. *Id.* The Working Group was instructed to consider such intangible factors as "climate risk, environmental justice, and intergenerational equity." JA 80, Doc. 6-2, at 3.

The Executive Order directed the Working Group to "solicit public comment; engage with the public and stakeholders; [and] seek the advice of ethics experts." JA 73, Doc. 6-1, at 6. It also directed the Working Group to "ensure that the SCC, SCN, and SCM reflect the interests of future generations in avoiding threats posed by climate change." *Id.* The Executive Order cited no statutory authority to create the Working Group or to set binding values for "social costs" that "shall" be used by

regulatory agencies exercising legislative authority delegated from Congress.

**B.     The Working Group Promulgates Binding Interim Values for the "Social Costs" of Carbon Dioxide, Methane, and Nitrous Oxide.**

On February 26, 2021, the Working Group promulgated its Interim Values for the social costs of carbon, methane, and nitrous oxide. JA 76, Doc. 6-2 ("Interim Values" or "2021 TSD"). Although EO 13990 instructed the Working Group to elicit input from the public and stakeholders, the Working Group did not do so before publishing the Interim Values. *See id.* The Interim Values were simply published without any prior notice or opportunity for public comment. *Id.*

The Working Group defined the "social cost of greenhouse gases" or "SCGG" as "the monetary value of the net harm to society associated with adding a small amount of that GHG to the atmosphere in a given year." JA 79, Doc. 6-2, at 2. The Working Group acknowledged that the task of assigning "social costs" to greenhouse gases involves attempting to predict global "changes in net agricultural productivity, human health effects, property damage from increased flood risk natural disasters, disruption of energy systems, risk of conflict, environmental migration, and the value of ecosystem services." *Id.* This includes "spillover pathways such as economic and political destabilization and global migration." JA 80, Doc. 6-2, at 3. In other words, this task involves attempting to predict such unknowable contingencies as the likelihood, frequency, scope, and severity of future international conflicts and human migrations for three centuries into the future. *Id.*

6

The Working Group also admitted that its calculations involve attempting to predict future developments in human technology and innovation for centuries to come, future mitigation strategies performed by the world's 195 nations, and global atmospheric concentrations due to greenhouse gas emissions. *See, e.g.*, JA 93, Doc. 6-2 at 16; JA 107, *id.* at 30.

The Working Group conceded that "[b]enefit-cost analysis of U.S. Federal regulations have traditionally focused on the benefits and costs that accrue to individuals that reside within the country's national boundaries." JA 91, Doc. 6-2, at 14. But the Interim Values reflect a policy and value judgment to consider in their calculation the anticipated *global* effects of greenhouse gases, not just their anticipated effects within the United States. JA 91–93, *id.* at 14–16.

Under the Working Group's approach, one critical factor in calculating the present dollar value for the "social cost" of a greenhouse gas is the "discount rate." JA 93–99, *id.* at 16–22. "In calculating the SC-GHG, the stream of future damages to agriculture, human health, and other market and non-market sectors from an additional unit of emissions are estimated in terms of reduced consumption (or consumption equivalents). Then that stream of future damages is discounted to its present value in the year when the additional unit of emissions was released." JA 94, *id.* at 17. The lower the discount rate, the higher the "social cost" of that gas.

The Working Group acknowledged that "the discount rate has a large

7

influence on the present value of future damages." JA 94, *id.* For example, the Working Group calculated the social cost of each gas at four different values using three different discount rates—5%, 3%, and 2.5%, and a 95% probability distribution for the 3% rate. Using these different discount rates, the "social cost" of carbon dioxide ranges from $14 per metric ton to $152 per metric ton, depending on the discount rate selected. JA 82, *id.* at 5. The Working Group admits that "the range of discount rates reflects both uncertainty and, at least in part, *different policy or value judgments*." JA 101, *id.* at 27 (emphasis added). These include "intergenerational ethical considerations," which must "be accounted for in selecting future discount rates." JA 80, *id.* at 3. According to the Working Group, "the choice of a discount rate … *raises highly contested and exceedingly difficult questions of science, economics, ethics, and law*." JA 104, *id.* at 17 (emphasis added).

The Interim Values calculate that the current "social costs" of carbon, methane, and nitrous oxide, at current rates of emission, are very significant. Among the range of values provided, the Interim Values provide the 3% discount rate as the baseline for agency calculations, but they also invite federal agencies to use smaller discount rates that will increase the calculation of the social cost of gases, including the 2.5% discount rate. JA81, Doc. 6-2, at 4. Under the Interim Values, the current "social cost" of carbon dioxide in 2020 is $51 per metric ton at the 3% discount rate, $76 per metric ton at the 2.5% discount rate, and $152 per metric ton at the upper

8

probability distribution of the 3% rate. JA 80, *id.* at 5. The "social cost of methane" at the 3% rate in 2020 is $1,500 per metric ton, $2,000 per metric ton at 2.5%, and $3,900 at the upper distribution of the 3% rate. *Id.* The "social cost of nitrous oxide" at the 3% discount rate in 2020 is $18,000 per metric ton, $27,000 per metric ton at 2.5%, and $48,000 per metric ton at the upper probability distribution of 3%. *Id.* All of these values increase significantly over time. JA 79, *id.* at 4. The Working Group emphasizes that, on its view, these values "likely underestimate" the actual social costs of those three gases: "It is the IWG's judgment that … the range of four interim SCGG estimates presented in this TSD *likely underestimate* societal damages from GHG emissions." *Id.* (emphasis added).

## C.    The Impact of the Working Group's Interim Values.

As noted above, using the 3%, 2.5%, and 95-percentile-of-3% discount rates, the "social cost" of carbon in 2020 was $51, $76, and $152 per metric ton, respectively; the "social cost" of methane was $1500, $2000, and $3900 per metric ton, respectively; and the "social cost" of nitrous oxide was $18,000, $27,000, and $48,000 per metric ton, respectively. JA 82–83, Doc. 6-2, at 5–6. In 2019, the most recent year for which data is available, the United States emitted 5.274 billion metric tons of carbon dioxide, 26.4 million metric tons of methane, and 1.54 million metric tons of nitrous oxide. EPA, *Draft Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2019* 2-6 tbl.2-2 (Feb. 12, 2021). Thus, assuming similar rates of

9

emission between 2019 and 2020, according to the Working Group, the total "social cost" of emissions of all three gases in 2020 at the 3% discount rate was over $336 billion; the total "social cost" at the 2.5% discount rate was over $495 billion; and the total "social cost" at the 95th-percentile distribution was over $978 billion. *Id.*

These enormous "social costs" will lead to comparable increases in regulatory burdens. Even before EO 13990 made the use of SCGG analysis mandatory, there had been "at least eighty-three separate regulatory or planning proceedings conducted by six different federal agencies [that] ha[d] used the SCC or SCM in their analyses" through mid-2016. Howard & Schwartz, *Think Global: International Reciprocity as Justification for a Global Social Cost of Carbon*, 42:S COLUM. J. OF ENVT'L LAW 203, 219–20 & appx. A (2017); *see also* JA 125, Doc. 6-3. Through mid-2016, the "social cost" of carbon dioxide and methane had been used in federal agency actions related to vending machines, light trucks, dishwashers, dehumidifiers, microwave ovens, kitchen stoves, clothes washers, small electric motors, residential water heaters, ozone standards, residential refrigerators and freezers, sewage guidelines, medium and heavy-duty vehicles, mercury emissions, industrial boilers, solid waste incineration units, fluorescent lamps, residential clothes dryers, room air conditioners, residential furnaces, residential central air conditioners, battery chargers, dishwashers, petroleum refineries, halide lamps, walk-in coolers and freezers, commercial refrigeration units, commercial clothes

washers, commercial ice makers, and heat pumps.  *Id.*

**D.    Procedural History.**

On March 8, 2021, Plaintiffs-Appellants the States of Missouri, Arizona, Arkansas, Indiana, Kansas, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, and Utah ("Plaintiffs" or "the States") filed suit in the Eastern District of Missouri, challenging EO 13990 and the Working Group's Interim Values.  JA 12. The lawsuit named as defendants both the members of the Working Group and federal agencies that "shall" use the Interim Values, including EPA, DOE, FERC, DOT, USDA, DOI, and BLM.  JA 20, Doc. 6.  Plaintiffs filed their First Amended Complaint (adding Alaska as a Plaintiff) on March 26.  *Id.* ("Complaint").

The Complaint included nine pages and forty-two paragraphs of allegations regarding injury to the States, based on eight separate theories.  JA 46–55, *id.* at 29–38, ¶¶ 153–194.  These included: (1) violation of the principles of federalism that are specifically designed to preserve the independent role of the States, JA 46, *id.* at 29; (2) injury to the States' sovereign interests from the preemption of state laws and regulations in traditional areas of state authority, JA 46–48, *id.* at 29–31; (3) direct injury to the States' sovereignty by dictating how they must administer cooperative-federalism programs, JA 48–51, *id.* at 31–34; (4) injury to the States' proprietary interests as purchasers of goods and services whose costs will increase from the Interim Values, JA 51–52, *id.* at 34–35; (5) injury to the States' quasi-sovereign

11

interests from the "enormous regulatory costs on the economies and citizens of the States" to be imposed by the Interim Values, JA 53–54, Doc. 6, at 36–37; (6) injury to the States' sovereign and proprietary interests in future tax revenues, JA 53, Doc. 6, at 37; and (8) denial of the opportunity to participate in notice-and-comment when the Working Group formulated the Interim Values, JA 54–55, Doc. 6, at 37–38.

Plaintiffs alleged that EO 13990 and the Working Group's actions were unlawful on four grounds. First, the Complaint alleged that the President and the Working Group violated the separation of powers by exercising quintessential legislative authority without any delegation from Congress. *Id.* Second, the Complaint alleged that the President and the Working Group violated agency statutes that delegated authority to the various agencies, not to the President or the Working Group, to adopt substantive rules in their areas of authority. JA 55–56; *id.* at 38–39. Third, the Complaint alleged that the Working Group violated the Administrative Procedure Act (APA) by issuing the Interim Values without notice and comment. JA 56–57; *id.* at 39–40. Fourth, the Complaint alleged that the Interim Values were both contrary to law and substantively arbitrary and capricious under the APA. JA 57–58; *id.* at 40–41.

On May 3, Plaintiffs filed a motion for preliminary injunction on Counts One and Three of the Complaint. JA 143, Doc. 18. The Government filed a motion to dismiss on June 4, challenging Plaintiffs' standing to sue and ripeness. JA 239, Doc.

28.  In its briefs in the district court, the Government conceded that the Working Group possessed no delegation of legislative authority: "No statute establishes it, nor delegates it any legislative authority."  JA 294; Doc. 28, at 54.

In the district court, the Government also conceded that, under the plain terms of EO 13990, the Working Group's Interim Values are *binding* on executive agencies, unless a statute forbids their use.  JA 276, Doc. 28, at 36 (admitting that "the Executive Order *requires* agencies to use the Interim Estimates in some circumstances," because § 6(b)(ii)(A) of EO 13990 "us[es] the word 'shall'").  The Government conceded that "agencies will … rely on the Interim Estimates when they have *discretion* to do so."  *Id.* (italics in original); *see also* JA 529, Doc. 37, at 26 (admitting that "the Executive Order is *binding* on agencies" in many circumstances) (emphasis added).  The only exception to this rule that the Government acknowledged was when a statute *forbids* the agency to use the Interim Values.  *See id.*  In other words, if a federal agency *may* consider the social cost of greenhouse gases in the exercise of its statutory authority, it *must* do so under EO 13990, and furthermore, it *must use the specific "social cost" values promulgated by the Working Group.  Id.*  Further, if a statute requires a federal agency to consider the social cost of greenhouse gases, then that agency may not do its own calculations, but it must use the specific values promulgated by the Working Group.  *Id.*

On August 31, 2021, the district court entered its Memorandum and Order

13

granting the Government's motion to dismiss for lack of standing and ripeness. Add. A1; JA 533, Doc. 48, at 2. On September 1, 2021, Plaintiffs timely filed their notice of appeal. JA 530, Doc. 50.

### E. Use of Interim Values in Ongoing Rulemakings.

As the case developed, federal agencies commenced rulemakings that involve the Interim Values. For example, just before the publication of the Interim Values, on February 24, 2021, FERC sought comments on the certification of new interstate natural gas facilities, 86 Fed. Reg. 11268, and sought extensive input on the use of "social cost" analysis. JA 220, Doc. 20-1. Subsequent to the Interim Values, EPA sought comment on calculation of the "social costs" of hydrofluorocarbons. 86 Fed. Reg. 27150 (May 19, 2021). On August 10, 2021, EPA and Department of Transportation sought public comments on proposed revised emissions standards for 2023 and later-model light-duty vehicles. 86 Fed. Reg. 43759.

These proceedings illustrate the practical impact of using the "social cost of greenhouse gases" analysis, because they claim "social costs" from greenhouse gases that dwarf pocketbook harms from increased regulation. For example, EPA's final rule on Phasedown of Hydrofluorocarbons estimates that its net benefits through 2050 will be $260 billion dollars (through climate benefits), which offset roughly $11.8 billion in costs. 86 Fed. Reg. 51118–119 (Oct. 5, 2021); *see id.* tbl. 1 n.d. Similarly, EPA's proposed Revised 2023 and Later Model Year Light-Duty

Vehicle Greenhouse Gas Emissions Standards rule claims that the present value of social benefits from emissions reductions range from $22 billion to $280 billion. 86 Fed. Reg. 43759 tbl. 59 (Aug. 10, 2021). By using the Interim Values to inflate the social benefits of emission reductions, the EPA claims that "the total benefits far exceed the costs," which amount to $240 billion at a three percent discount rate. *Id.* at 43753 tbl. 4. EPA indicates that these "social costs" will offset real-world pocketbook harms from "increase in up-front new vehicle costs [that] has the potential to increase the prices of used vehicles" and "mak[ing] credit more difficult to obtain." 86 Fed. Reg. 43737.

## SUMMARY OF ARGUMENT

I. The district court erred in holding that Plaintiffs lacked Article III standing to challenge the Working Group's Interim Values until they are used in a rulemaking or other action by another federal agency. The district court overlooked the fact that the President's Executive Order purports to give a binding command to *state* agencies engaged in the administration of cooperative-federalism programs, and thus it inflicts a direct and already-complete injury to States' freedom. Likewise, the States have already suffered the procedural injury of being denied the opportunity to participate in notice-and-comment regarding the Interim Values. The district court wrongly dismissed that procedural injury as an interest "in *vacuo*," when the Interim Values have an enormous practical impact, including on the scope of federal

15

regulatory power.

The district court also erred in holding that the States' injuries from the Interim Values' use in future rulemakings were too speculative. Such rulemakings are already occurring, including before Defendants EPA, FERC, and Department of Transportation, and many more such rulemakings are inevitable. The Government concedes that the Interim Values purport to be *binding* in future agency actions, unless a federal statute specifically prohibits their use. Plaintiffs' theory of standing merely relies on the prediction that such federal agencies will obey an Executive Order from the President to treat the Interim Values as binding. This is far *less* speculative than predicting, for example, that a particular EPA emissions standard will affect the global mix of greenhouse gases enough to prevent the erosion of Massachusetts' coastline over 100 years. And in *Bennet v. Spear*, 520 U.S. 154, 168-69 (1997), the Supreme Court held that plaintiffs had standing to challenge an agency action that "alters the legal regime" to which a second agency is subject, without waiting for the second agency to act. So also here.

The district court also erred in holding Plaintiffs' claims unripe. The States' claims are fit for judicial resolution now because three claims raise purely legal issues, and the fourth—that the Interim Values are substantively arbitrary and capricious under the APA—addresses only the validity of the Working Group's already-completed actions, not the as-yet-undetermined actions of another agency.

16

And the hardship from delaying resolution to the States is clear and manifest. By depriving the States the opportunity to oppose the Interim Values before the Working Group, the district court effectively insulated the wildly speculative Interim Values from the rigors of notice-and-comment rulemaking and judicial review.

II. In addition to reversing the district court's erroneous decisions on standing and ripeness, the Court should also remand with instructions to enter a preliminary injunction. *See Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020). Plaintiffs are likely to succeed on the merits because the Government has conceded that the Working Group has no delegated legislative authority. Yet the promulgation of *binding* values for the "social costs" of greenhouse gases for all federal agencies to use in formulating regulatory policy is a quintessentially legislative action, and so the President and the Working Group plainly violated the separation of powers. And the Working Group clearly ignored its notice-and-comment obligations under the APA. The States will suffer at least seven forms of irreparable harm from these unlawful actions. All other equitable factors strongly favor an injunction forcing the Executive to comply with the law and preventing this ongoing violation of the separation of powers, our most fundamental bulwark of liberty.

# ARGUMENT

## I. The District Court Erred in Dismissing the Complaint for Lack of Standing and Ripeness.

This district court held that that Plaintiffs lacked standing to sue under Article III and their claims were unripe. App. A1. These holdings were in error.

***Standard of Review.*** The district court's decision to dismiss the Amended Complaint for lack of standing and ripeness is reviewed *de novo*. *Iowa League of Cities v. EPA*, 711 F.3d 844, 861 (8th Cir. 2013). In deciding a motion to dismiss, the Court "assum[es] all factual allegations as true and constru[es] all reasonable inferences in favor of the nonmoving party." *Usenko v. MEMC LLC*, 926 F.3d 468, 472 (8th Cir. 2019).

### A. The Interim Values Purport To Be Binding on Federal Agencies.

Two points are central here, and they directly contradict each other: First, the Working Group has no delegation of any legislative authority. As the Government admits: "No statute establishes it, nor delegates it any legislative authority." JA 307; Doc. 28, at 54.

Second, the Working Group's Interim Values purport to be *legally binding* on federal agencies that conduct any rulemakings (exercising legislative power) and other agency actions that address gas emissions. Section 5(b)(ii)(A) of EO 13990 states that the Working Group shall "publish an interim SCC, SCN, and SCM within

18

30 days of this order, which agencies ***shall*** use when monetizing the value of changes in greenhouse emissions resulting from regulations and other relevant agency actions…."  JA 23; Doc. 6, at 5 (emphasis added).  "[T]he word 'shall' usually connotes a requirement … 'shall' is 'mandatory' and 'normally creates an obligation impervious to judicial discretion.'"  *Kingdomware Technologies, Inc. v. United States*, 579 U.S. 162, 136 S. Ct. 1969, 1979 (2016).  "[T]he language used to express" the President's directive in EO 13990 "is the type of language we have viewed as binding because it speaks in mandatory terms."  *Iowa League of Cities*, 711 F.3d at 864.

The Government concedes that Interim Values are binding on executive agencies engaged in rulemakings, unless a statute forbids their use.  JA 276, Doc. 28, at 36.  The Government concedes that "agencies will … rely on the Interim Estimates when they have *discretion* to do so."  *Id.* (italics in original); *see also* JA 496, Doc. 37, at 26 (admitting that "at least in some contexts, the Executive Order is *binding* on agencies") (emphasis added).  Under EO 13990, unless a statute specifically prohibits their use, agencies *must* monetize the social costs of greenhouse gases in conducting agency actions, and they *must* use the Working Group's numbers in doing so.  *Id.*

EO 13990 also goes beyond previous executive orders by dictating that the Interim Values must be used in formulating substantive policies and rules that

19

directly affect regulated parties. *See* JA 23, Doc. 6, at 5 (EO 13990); JA 379, Doc. 28-4, at 3 (OIRA guidance). The Interim Values are to be used "where an agency will take final action in reliance on a benefit-cost analysis that includes estimates of the social cost of greenhouse gas emissions." JA 379; Doc. 28-4, at 3. Thus, the Interim Values' use purports to be mandatory in formulating final agency actions that bind the regulated public—not just internal regulatory impact statements submitted to OIRA. The district court's analysis of standing and ripeness persistently overlooks the legally binding nature of the Interim Values.

## B. Plaintiffs Have Standing Based on Injuries That Do Not Flow From Future Regulations.

The district court assumed that all Plaintiffs' theories of standing depended on the impact of *future* regulations that agencies would adopt while using the Interim Values. App. A15–16; JA 519–520. The district court reasoned: "Plaintiffs ask this Court to assume that at some point in the future, one or more agencies will 'inevitably' issue one or more regulations that rely in some way upon the Interim Estimates…." *Id.* The district court overlooked two forms of injury-in-fact that did not depend on the impact of future regulations but were immediate, direct, and already inflicted by the time the Complaint was filed: (1) directly commanding and commandeering the States in their implementation of cooperative-federalism programs, and (2) denial of the opportunity to participate in notice-and-comment

20

procedures before the Working Group. The district court addressed the latter injury only as an afterthought, and did not address the former at all.

### 1. EO 13990 inflicts sovereign injury on the States by commanding and commandeering state agencies on how to administer cooperative-federalism programs.

The Amended Complaint contains four pages and seventeen paragraphs of allegations describing how EO 13990 and the Interim Values purport to dictate how state agencies must conduct their duties in cooperative-federalism programs. JA 49–52, Doc. 6, at 31–34, ¶¶ 162–178. As the Complaint alleged, "in their sovereign capacities, the Plaintiff States cooperatively administer many federal programs directly affected by the Working Group's actions, and the Executive Order and the Working Group's Interim Values will directly impact the actions they must take in their participation in these cooperative-federalism programs." JA 49, *id.* at 31, ¶ 162. "The President's Executive Order and the Working Group's actions effectively mandate that the Plaintiff States, in their cooperative administration of federal programs, must take actions that they deem unconstitutional, unlawful, and arbitrary and capricious, for the reasons stated herein." *Id.* Because the States participate, not just as regulated parties, but as *regulators* in many federal agency actions, they are directly affected by the unlawful diktats of EO 13990 and the Interim Values.

The Complaint provides several examples of such injuries. For example, citing 40 C.F.R. § 1501.7(b), the Complaint alleges that "[u]nder the Executive

21

Order, the agencies of the Plaintiff States must now employ the Working Group's Interim Values in their NEPA environmental impact statements or face disapproval and rejection by the federal agencies." JA 51, Doc. 6, at 33. The States also serve as "joint lead" agencies on federally funded transportation projects, and they "regularly engage in federally funded highway projects that require the States to conduct NEPA assessments, which will now have to include the Interim Values or face rejection by the Department of Transportation." *Id.* Likewise, "[u]nder EO 13990, agencies of the Plaintiff States will be required to adopt and employ the Working Group's Interim Values in State Implementation Plans submitted under the Clean Air Act in order to obtain approval by EPA." JA 52, *id.* at 34 (citing 42 U.S.C. § 7410(a)(1) & (a)(2)(H)(i)). Further, "Plaintiff State of Missouri is a "no stricter than state' for most emissions standards promulgated by EPA," which "effectively requires Missouri … to enforce through its State Implementation Plans the clean-air standards adopted by EPA, including those standards that incorporate and rely on the Interim Values." *Id.* (citing Mo. Rev. Stat. § 643.055). "Thus, Section 5 of EO 13990 and the Interim Values purport to legally obligate" the Plaintiff States, in their "administration of cooperative-federalism programs…, to enforce illegally and unconstitutionally adopted standards." *Id.*

A federal Executive Order that purports to command and control how state agencies must administer of cooperative-federalism programs inflicts an immediate

and direct injury on state sovereignty, because it directly deprives the States of freedom and discretion that they otherwise would have had in administering these programs. *Cf. Printz v. United States*, 521 U.S. 898, 916 (1997). This sovereign injury does not depend on the impact of a future agency action, because it immediately affects how States participate in *formulating* agency actions. This injury-in-fact is complete, it is caused by Defendants' unlawful actions, and it is directly redressable. It alone suffices to give the States standing. The district court simply overlooked these injuries. *See* App. A15–A22; JA 519–526.

The district court quoted *Lujan*'s statement that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." App. A15, JA 519 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)). But because they cooperate in the administration of federal regulatory programs, the States *are* "the object of the government action" that they challenge. *Id.*

## 2. The Working Group injured the States by denying the opportunity to participate in notice-and-comment regarding the Interim Values.

In addition, the Complaint alleges, and the Government does not dispute, that "the Working Group did not elicit or receive comments or input from the public or stakeholders before publishing the Interim Values." JA 36, Doc. 6, at 18; *see also* JA 42, 43–44, *id.* at 24, 25–26. Plaintiffs alleged that the Working Group "depriv[ed]

them of opportunities to provide input and comment prior to adoption of the Interim Values." JA 47, *id.* at 29; JA 55–56, *id.*at 37–38. These injuries were concrete, immediate, and completed on February 26, 2021, when the Working Group published the Interim Values.

The deprivation of the right to participate in notice-and-comment rulemaking is an Article III injury, which is redressable by vacating the agency action and requiring the agency to proceed with notice-and-comment rulemaking. In *Iowa League of Cities*, plaintiffs challenged EPA letters announcing new, binding regulatory requirements that were issued without notice-and-comment. 711 F.3d at 870-71. This Court held that the denial of the right to participate in notice-and-comment constituted a redressable injury that conferred Article III standing. *Id.* "[T]he violation of a procedural right can constitute an injury in fact 'so long as the procedures in question are designed to protect some threatened concrete interest of the petitioner that is the ultimate basis of his standing.'" *Id.* (quoting *Lujan*, 504 U.S. at 573 n.8). The Court noted that the League had a "concrete interest … in avoiding regulatory obligations above and beyond what can statutorily be imposed on them." *Id.* at 871. "Notice and comment procedures for EPA rulemaking under the CWA were undoubtedly designed to protect the concrete interests of such regulated entities by ensuring that they are treated with fairness and transparency after due consideration and industry participation." *Id.*

24

Notably, the plaintiff is not required to prove that the outcome of the agency's proceeding would have been different if its input had been considered. "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7. "If a petitioner 'is vested with a procedural right, that litigant has standing if there is *some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Iowa League of Cities*, 711 F.3d at 871 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)). Thus, "redressability in this context does not require petitioners to show that the agency would alter its rules upon following the proper procedures." *Id.*; *see also Nat'l Ass'n of Home Builders v. E.P.A.*, 667 F.3d 6, 15 (D.C. Cir. 2011).

Here, there is undoubtedly "some possibility" of a different outcome if the States and other interested parties were allowed to submit their comments. The entire project of calculating a supposed "social cost" of greenhouse gases over a 300-year horizon is wildly speculative and unscientific. JA 210, Doc. 19, at 5 (Dayaratna Decl.); JA 427, Doc. 35-2, at 6 (comment to Working Group). Even if the Working Group adhered to its same conclusions in the face of such comments, the chances are excellent that its conclusions would not survive judicial review for arbitrariness and lack of reasoned decisionmaking.

25

In concluding otherwise, the district court held that the States were merely asserting "a procedural right *in vacuo*." App. A20–21, JA 524–525 (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009)). This reasoning is unpersuasive. In *Summers*, plaintiffs challenged a Forest Service regulation that exempted smaller salvage-timber projects from notice-and-comment procedures, contending that they were unlawfully denied the opportunity to comment on the "Burnt Ridge" salvage-timber sale. 555 U.S. at 490–91. The district court "granted a preliminary injunction against the Burnt Ridge salvage-timber sale," and "[s]oon thereafter, the parties settled their dispute over the Burnt Ridge Project." *Id.* at 491. "[W]ith the Burnt Ridge dispute settled," there was "no other project before the court in which respondents were threatened with injury in fact," and no other project that they sought to comment upon. *Id.* The Supreme Court held that, once the underlying dispute regarding the Burnt Ridge project had been resolved, plaintiffs no longer had standing to challenge the rule exempting that project from notice and comment. *Id.* Plaintiffs were not entitled to challenge "the regulation in the abstract," *id.* at 494, or assert "a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*." *Id.* at 496.

*Summers* is clearly distinguishable. In *Summers*, a judgment requiring notice-and-comment would have made no difference, because *there was nothing left to comment on*. *Id.* at 491. After the Burnt Ridge dispute settled, the remainder of the

case merely challenged "the regulation in the abstract," based on "a procedural right *in vacuo.*" *Id.* at 494, 496. Here, by contrast, if the Court agrees that the Working Group was required to provide notice-and-comment, there will be a great deal for the States to comment upon. *See* JA 423, Doc. 35-2; JA 205 (Dayaratna Decl.). Indeed, because the President dictates that the Interim Values are *binding* on federal agencies, the only meaningful opportunity to comment on the methodology will be before the Working Group. Comments that attack the methodology or reliability of the Interim Values will carry no weight before a future agency that is bound in advance to accept them. Thus, the Executive Order dramatically tilts the playing field against those opposing the Interim Values in future notice-and-comment proceedings. *See, e.g., City of Los Angeles v. Barr*, 929 F.3d 1163, 1173 (9th Cir. 2019) ("[T]his inability to compete on an even playing field constitutes a concrete and particularized injury.").

The district court's conclusion effectively deprives Plaintiffs of any meaningful opportunity to comment on the Interim Values before a federal agency. "Notice and comment procedures secure the values of government transparency and public participation…." *Iowa League of Cities*, 711 F.3d at 873. The district court opined that Plaintiffs could submit comments to future federal agencies. *See* App. A20-21. But those agencies will be bound by the Interim Values. The States can comment to their hearts' content, but at the end of the day, under EO 13990, those

agencies "***shall*** use" the Interim Values "when monetizing the value of changes in greenhouse emissions resulting from regulations and other relevant agency actions…." JA 72; Doc. 6-1, at 5 (emphasis added). The district court's ruling effectively permits the Government to evade any notice-and-comment review of the Interim Values. This Court has properly rejected such outcomes by which "[a]n agency potentially can avoid judicial review through the tyranny of small decisions." *Iowa League of Cities*, 711 F.3d at 873.

Finally, the States' standing draws further support from the "special solicitude" afforded the States in the standing analysis. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). Given "the special position and interest" of the States in our federal system, "[i]t is of considerable relevance that the party seeking review here is a sovereign State and not … a private individual." *Id.* at 518. "Such special solicitude has two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests." *Texas v. Biden*, 10 F.4th 538, 549 (5th Cir. 2021). Here, where the States are "asserting a procedural right under the APA to challenge an agency action," *id.*, the first prong is satisfied. *See* JA 58, Doc. 6, at 40 (Count III). And the States made numerous plausible allegations that the use of "SGCC" analysis will adversely impact their "quasi-sovereign interests in the health and well-being, both physical and economic, of their citizens." *See* JA 54, *id.* at 36, ¶ 183.

Accordingly, the States are "indeed entitled to special solicitude," which "means redressability is easier to establish for … state litigants than for other litigants." *Texas*, 10 F.4th at 549.

The district court gave no weight to the States' "special solicitude" because it concluded that the States had failed to demonstrate any "concrete injury." App. A22, JA 526. This argument is erroneous for the reasons discussed in detail below. *Supra* Part I.D. Most fundamentally, the district court rested on its erroneous supposition that the States asserted a "highly attenuated chain of possibilities." App. A16, JA 520. But the States' prediction of injuries from agency action rests on the prediction that federal agencies will obey Executive Order 13990, which gives them a direct command to use the Working Group's inflated estimates for "social costs of greenhouse gases." JA 72, Doc. 6-1, at 5. Predicting that federal agencies will obey an Executive Order is a far less "attenuated chain of possibilities" than that which the Supreme Court upheld in *Massachusetts v. EPA* itself, which involved Massachusetts' prediction that a particular EPA regulation of emissions in American vehicles might change the global mix of greenhouse-gas emissions enough to prevent the loss of centimeters of Massachusetts coastline over 100 years. 549 U.S. at 522. Here, by contrast, the States merely predict that federal agencies will follow an Executive Order from the President.

Appellate Case: 21-3013    Page: 37    Date Filed: 12/03/2021 Entry ID: 5104488

## C. Plaintiffs Also Have Standing Based on the Interim Values' Use in Other Agencies' Actions.

As noted above, Plaintiffs alleged a host of injuries that relate to the fact that the Interim Values will inevitably expand the federal regulatory burdens on the States and their citizens in virtually every major sector of American economic life. *See* JA 53, Doc. 6, at 35. These included injuries from the expanded preemption of traditional areas of state authority, pocketbook injuries from increased costs to states as purchasers of more heavily regulated goods and services, quasi-sovereign interests in the economic well-being of their citizens, loss of future tax revenues, and similar injuries from the expansion of federal regulatory authority that the Interim Values will necessarily incur. JA 47–56, Doc. 6, at 29–38, ¶¶ 153–194. Indeed, the States explained that the increased regulatory burdens caused by the "social costs" would harm their proprietary interests in energy consumption by homes, industries, and farms, their energy production to neighboring states, and the tax revenue that arises from these economic activities used to support the States' activities. JA 193–197, Doc. 18, at 51–55. Plaintiffs have standing based on these injuries as well.

The district court summarized Plaintiffs' argument as follows: "Plaintiffs ask the Court to assume that [1] at some point in the future, one or more agencies will 'inevitably' issue one or more regulations that rely in some way upon the Interim Estimates; [2] that such agency will 'inevitably' disregard any objections to the methodology by which the Interim Estimates were calculated; and [3] this yet-to-be

30

identified regulation will then harm Plaintiffs in a concrete and particularized way." App. A15-A16. The district court dismissed this theory as "speculative," Add. A18, JA 522, and characterized it as "a highly attenuated chain of possibilities," Add. A16, JA 520, but the opposite is true. Each step follows legally and logically—indeed, "inevitably," *id.*—just as Plaintiffs urged.

*First*, [1] it is not "speculative" to assume that "at some point in the future, one more agencies will 'inevitably' issue one or more regulations that rely in some way upon the Interim Estimates." App. A15, JA 519. As noted above, several such rulemakings are already ongoing, in agencies such as EPA, DOT, and FERC, and agencies are already using SCGG analysis, based on the Interim Values, in formulating rules. One need not "speculate" that this may happen—it is already happening. And there will certainly be many more such rulemakings. For one, some courts have held that federal agencies under certain statutes *must* consider the "social cost" of greenhouse gases when conducting cost-benefit analysis in rulemakings. *See, e.g., Center for Biological Diversity v. National Hwy. Traffic Safety Admin.*, 538 F.3d 1172 (9th Cir. 2008). Such agencies, when they do so, are now bound by EO 13990 to use the Working Group's Interim Values. JA 72, Doc. 6-1, at 5. In addition, even when they had complete discretion to do so, federal agencies used SCGG analysis in eighty-three such rulemakings in the Obama Administration. JA 124, Doc. 6-3. Now, under EO 13990, any such agency that has discretion under its

31

statutory delegation to consider such "social costs," must consider them—and it must use the Working Group's values.

*Second*, [2] it is not "speculative" to assume that "such agency will 'inevitably' disregard any objections to the methodology by which the Interim Estimates were calculated."  App. A16, JA 520.  Each such agency has been ordered by the President to do so, JA 72, Doc. 6-1, at 5, and the Government agrees that this direction is "binding" on those agencies, in the absence of a contrary statutory command.  JA 276, Doc. 28, at 36.  It is not "speculative" to anticipate that federal agencies will obey a direct order from the President of the United States that the U.S. Department of Justice says is "binding" on them.

Indeed, this inference is far less speculative than those that have been held to satisfy Article III.  In *Department of Commerce v. New York*, for example, the Supreme Court held that plaintiff States demonstrated Article III standing to challenge the inclusion of a question about U.S. citizenship on the 2020 census questionnaire, based on the States' prediction that the citizenship question would induce some unspecified portion of respondents to violate the law by declining to respond to the census, and that this portion would be large enough to affect their federal funding.  139 S. Ct. 2551, 2565–66 (2019).  The Government argued that this chain of inferences was too speculative to satisfy Article III, *id.* at 2566, but the Supreme Court held that the plaintiffs had "show[n] that third parties will likely react

32

in predictable ways to the citizenship question, even if they do so unlawfully." *Id.* "Respondents' theory of standing does not rest on mere speculation about the decisions of third parties," the Court held, but "it relies instead on the predictable effect of Government action on the decisions of third parties." *Id.* Here, Plaintiffs predict that federal agencies under the President's supervision will obey an Executive Order from the President. This is far more than an assumption that "third parties will likely react in predictable ways," *id.*—it is a virtual certitude.

*Third*, [3] it is not "speculative" to predict that future "regulation[s] will then harm Plaintiffs in a concrete and particularized way." App. A16, JA 520. Justifying such increased regulatory burdens is *the whole point* of the Interim Values. It is not "speculative" to predict that they will function exactly as designed, and exactly as the President has instructed federal agencies to use them. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) (holding that an injury-in-fact is not conjectural or hypothetical if there is "a 'substantial risk' that the harm will occur"). There is a "substantial risk," *id.*, that federal agencies will use the Interim Values to justify greatly increased regulatory costs, because they have been ordered to do so and are already doing so. The function of "SCGG" analysis in justifying increased regulatory burdens is amply illustrated by the EPA actions regarding hydrofluorocarbons and light-duty-vehicle emissions discussed above. Statement of the Case, Part E. On this point as well, Plaintiffs "have met their burden of showing

33

that [federal agencies] will likely react in predictable ways," to the President's Executive Order—again, far more "predictable ways" than speculation about whether aliens will unlawfully decline to respond to the census. *Dep't of Commerce*, 139 S. Ct. at 2566.

The district court's reasoning suffers from an even more fundamental problem. In essence, the district court held that Article III standing could never exist until a future agency action based on the Interim Values is finalized. App. A16. But the Supreme Court has held the opposite. In *Bennett v. Spear*, 520 U.S. 154 (1997), the Court addressed a provision of the Endangered Species Act that required federal agencies whose projects might adversely impact an endangered species to seek a "biological opinion" from the Fish and Wildlife Service (FWS). *Id.* at 157–58. The FWS's "biological opinion" would assess the likely impact of the project on endangered species and make recommendations to the agency requesting the opinion (the "action agency") on how to mitigate any such impacts. *Id.* at 158. In *Bennett*, the Bureau of Reclamation, which sought a biological opinion from FWS regarding the impact of water levels in the Klamath Project, a series of dams and lakes in Oregon and California. *Id.* at 158–59. FWS issued a biological opinion to the Bureau of Reclamation finding a risk of adverse impact on endangered fish and recommending to the Bureau to mitigate that impact by maintaining certain (higher) water levels in two reservoirs. *Id.* at 159.

In *Bennett*, ranchers who "claim[e]d a competing interest in the water" sued the FWS, challenging its biological opinion, but did not sue the Bureau of Reclamation (the "action agency"). *Id.* at 160. The Government argued that the ranchers' alleged injuries lacked traceability and redressability under Article III because FWS's biological opinion was not binding on the Bureau of Reclamation, and the ranchers would not be harmed by it unless and until the Bureau of Reclamation took a final agency action based on it. *Id.* at 168. In other words, the Government contended that "the proximate cause of [the ranchers'] harm is an (as yet unidentified) decision by the Bureau regarding the volume of water allocated to petitioners, not the biological opinion itself." *Id.*

The Supreme Court unanimously rejected this argument. *Id.* at 168–69. The Court noted that, while the biological opinion was technically "advisory" to the Bureau, "in reality it has a powerful coercive effect" on the second agency, because it "alters the legal regime to which the action agency is subject." *Id.* If the "action agency" (the Bureau) wished to disregard FWS's recommendations in the biological opinion, it was required to articulate its reasons for disagree with FWS's conclusions. *Id.* Agencies seldom did so, and so the biological opinion would "play a central role in the action agency's decisionmaking process." *Id.* Under these circumstances, the Supreme Court held that the ranchers were *not* required to wait until the Bureau of Reclamation—the second agency, or "action agency"—had

35

issued a final agency action based on the biological opinion. *Id.* "This wrongly equates injury 'fairly traceable' to the defendant to injury as to which the defendant's actions are the very last step in the chain of causation." *Id.* at 168-69. Because the FWS's biological opinion "alter[ed] the legal regime" under which the Bureau would make its "as yet unidentified" policy, the ranchers had Article III standing to sue FWS to challenge the biological opinion. *Id.* at 169–70.

*Bennett* is controlling here. By holding that Plaintiffs could not sue to challenge an "as yet unidentified" agency action using the Interim Values, the district court wrongly held that Plaintiffs could only challenge "the very last step in the chain of causation." *Id.* at 169. Here, the Interim Values plainly "alter[] the legal regime" under which other agencies conduct rulemakings and other agency actions, because they dictate the outcome of a specific, extremely important aspect of the agency's cost-benefit analysis—just like in *Bennett*. Indeed, Plaintiffs here have a stronger case for Article III standing, because in *Bennett*, the second agency was "technically free to disregard the Biological Opinion." *Id.* at 170. Here, by contrast, the "action agencies" are *not* "free to disregard" the Interim Values. *Id.* The Interim Values are "binding" on them, JA 276, Doc. 28, at 36, and the President dictates that they "shall" use them unless a federal statute specifically prohibits it. JA 72, Doc. 6-1, at 5. *See City of Kennett, Missouri v. EPA*, 887 F.3d 424, 431 (8th

Cir. 2018) (holding that plaintiffs had standing to challenge a policy that was "binding" on a future agency action that had not yet been implemented).

The district court sought to distinguish *Bennett* on the ground that "neither EO 13990 nor the Interim Estimates mandate the particular regulations" by the future agencies, and thus "[i]t is implausible to suggest that the Interim Estimates alters [*sic*] the legal regime to which agencies are subject." Add. A19, JA 523. But the same was true in *Bennett*. *Bennett* repeatedly acknowledged that the biological opinion did *not* "mandate" any "particular regulation," *id.*—in fact, the agency could disregard it entirely and make its own findings. But the Supreme Court still held that the ranchers did not need to await the "as yet unidentified" action of the Bureau to challenge FWS's biological opinion. 520 U.S. at 168–69. Further, the district court's statement that the Interim Values do not "alter[] the legal regime to which agencies are subject," Add. A19, JA 523, is simply incorrect. Unless they are specifically forbidden to do so by statute, agencies *must* monetize the social cost of greenhouse gases when formulating regulations, and in doing so, they *must* use the Working Group's values. As a legal matter, the Interim Values bind the agencies' hands to a specific approach, and specific set of numerical values, on what is typically the most dominant or critical factor in assessing the costs and benefits of agency action. This "alter[s] the legal regime." *Id.*; *see also Iowa League of Cities*, 711 F.3d at 870 ("The EPA disputes [Article III] causation because it argues that the

37

letters are *not binding*. Because we have ruled otherwise, we find that the League has established causation.") (emphasis added).[1]

In concluding that Plaintiffs lacked standing, the district court cited a series of cases, but none support its conclusion. First, the district court relied heavily on *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), holding that the Interim Values "merely prescribe standards and procedures governing the conduct of federal agencies." Add. A16, JA 520 (citing *Summers*, 555 U.S. at 493). But the district court misconstrued *Summers* for the reasons described in detail above. *Supra* Part I.B.2. In *Summers*, there was no injury from the deprivation of notice-and-comment rulemaking because, after the dispute over the Burnt Ridge project was settled, there was nothing left for the plaintiffs to comment on. 555 U.S. at 490–91. The opposite is true here.

---

[1] *Bennett* demonstrates that it is not too *early* for the States to challenge the Interim Values. On the flip side, *Regents of the University of California v. Department of Homeland Security*, 140 S. Ct. 1891 (2020), raises the concern that a challenge brought against a subsequent agency may be too *late*. In *Regents*, the Acting Secretary of DHS issued a memorandum terminating DACA based in large part on a prior determination by the Attorney General that DACA was unlawful. *Id.* at 1910. The Supreme Court criticized the lower courts for rejecting the Secretary's reliance on that legal opinion, because those arguments "overlook[e]d an important constraint on [the Secretary's] decisionmaking authority—she was *bound* by the Attorney General's legal determination," and it questioned "whether [the Secretary] was required to explain a legal conclusion that was not hers to make." *Id.* (italics in original).

The district court cited *Clapper v. Amnesty International*, 568 U.S. 398, 401 (2013), Add. A16, JA 520, but that case is inapposite. In *Clapper*, the plaintiffs' challenge was based on a "highly speculative fear" that (1) the Government would target their foreign contacts for FSIA surveillance, (2) the Government would use FSIA as the method of surveillance, (3) the FSIA court judges would authorize surveillance, (4) the Government would succeed in intercepting foreign communications, and (5) the plaintiffs would happen to be parties to those intercepted foreign communications. *Id.* at 410. This "highly attenuated chain of possibilities," *id.*, bears no resemblance to this case, where Plaintiffs merely predict that federal agencies will follow an Executive Order from the President.

The district court also relied on *City of Kennett, Missouri v. EPA*, 887 F.3d 424 (8th Cir. 2018), Add. A17, A19, JA 521, 523, but that case directly supports Plaintiffs here. In *Kennett*, this Court held that the City's reasonably anticipated future injuries from a regulation that had not yet been implemented constituted injury-in-fact for standing purposes. *Id.* at 431 ("The City's injury is certainly impending despite Missouri's 'intention,' expressed in the TDML, to review the DO criterion before implementing the TDML."). This holding was precisely because "the TDML's wasteload allocations are binding on future permits," and thus "[t]o say that the permit will comply with the TDML is not 'conjectural.'" *Id.* The same reasoning applies here. Here, the Working Group's Interim Values "are binding on

Appellate Case: 21-3013    Page: 47    Date Filed: 12/03/2021 Entry ID: 5104488

future" agency actions, and thus "[t]o say that the [future actions] will comply with the [Interim Values] is not 'conjectural.'" *Id.* In addition, *Kennett* emphasized that the City was not required to demonstrate that the agency would come to a different conclusion if the case was vacated for further proceedings, *id.* at 432. "Redressability is met where a favorable decision 'avoids, or at least delays,' a regulatory burden." *Id.* (quotation omitted). Here, if the Interim Values were vacated, that would "avoid[], or at least delay[]," the increased "regulatory burden" from agency actions bound by the Interim Values. *Id.*

The district court also cited *National Ass'n of Home Builders v. EPA*, 667 F.3d 6, 13 (D.C. Cir. 2011), but that case does not support it. In *NAHB*, the D.C. Circuit held that plaintiffs lacked standing to challenge a preliminary jurisdictional determination that certain waters were subject to EPA jurisdiction, when that preliminary determination did not require regulation and had no determinative impact on any future regulation. *Id.* at 13–14. Thus, "NAHB members face only the *possibility* of regulation." *Id.* at 13. Here, by contrast, the Interim Values are *binding* on future agencies when monetizing the costs of greenhouse gases, so the Interim Values have a "virtually determinative impact" on future rulemakings, and they "alter[] the legal regime to which the action agency is subject." *Bennett*, 520 U.S. 171. In fact, consistent with *Bennett*, *NAHB* indicated that standing would exist if there had been "an additional allegation that the [jurisdictional determination]

40

substantially increased the risk of regulation or enforcement," 667 F.3d at 14, which is directly supports Plaintiffs here.

Finally, the district court accused Plaintiffs of doing "what the Supreme Court cautioned against in *Lujan*," by seeking to challenge a "more generalized level of Government action." Add. A20, JA 524 (citing *Lujan v, National Wildlife Federation*, 497 U.S. 871, 894 (1990) ("*Lujan I*")). Again, this is incorrect. As the Supreme Court held, the "land withdrawal review program" at issue in *Lujan I*, which encompassed "1250 or so individual classification terminations and withdrawal revocations," 497 U.S. at 890, was not an "agency action" in any sense, "much less a 'final agency action' within the meaning of [the APA]." *Id.* at 891. "The term 'land withdrawal review program' … is simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by the FLPMA." *Id.* Here, by contrast, the Interim Values "refer to a single [Working Group] order or regulation," *id.*, with specific, concrete, and *mandatory* application in future agency actions. Thus, they are not a "more generalized level of Government action," Add. A20, JA 524; on the contrary, they are more a *specific* level of Government action, because they dictate the outcome of a specific, discrete, individual (and critical) issue within *broader* rulemaking efforts.

41

In fact, it is the *Government* that is seeking to avoid the burdens of asserting its SCGG policies through individual rulemakings by agencies that actually have delegated authority in the area. The *Government* seeks to avoid the burdens of the "case-by-case approach," Add. A20, JA 524, by adopting an immensely consequential policy and forcing it on all federal agencies and the regulated public all at one stroke, in a manner that evades notice-and-comment rulemaking, ignores statutory delegations to specific agencies, and violates the separation of powers.

In sum, Plaintiffs established injury, causation, and redressability for the injuries alleged in the Complaint, and the district court erred in dismissing the Complaint for lack of Article III standing.

### D. The District Court Erred in Holding Plaintiffs' Claims Unripe.

In the alternative, the district court held that Plaintiffs' claims were unripe because they were not "fit" for judicial review and that delaying judicial review would impose no "hardship" on the States. Add. A23–29, JA 527–533. This, too, was error.

To establish ripeness, "[a] party seeking review must show both 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Iowa League of Cities v. EPA*, 711 F.3d 844, 867 (8th Cir. 2013) (citation omitted). The showing required is "minimal": "Both of these factors are



Appellate Case: 21-3013 Page: 50 Date Filed: 12/03/2021 Entry ID: 5104488

weighed on a sliding scale, but each must be satisfied 'to at least a minimal degree.'" *Id.*; *see also City of Kennett*, 887 F.3d at 432–33.

### 1. Plaintiffs' claims are plainly "fit" for review.

"Fitness rests primarily on whether a case would 'benefit from further factual development,' and therefore cases presenting purely legal questions are more likely to be fit for judicial review." *Iowa League of Cities*, 711 F.3d at 867. Here, three of Plaintiffs' four claims present "purely legal questions." *Id.* Whether the President and the Working Group violated the separation of powers by exercising quintessentially legislative power without a delegation from Congress is a purely legal question. JA 56, Doc. 6, at 38. Whether the Working Group violated the APA by failing to provide notice-and-comment is a purely legal question. JA 58, Doc. 6, at 40. And whether the President's directive violates the organic statutes of federal agencies by exercising power delegated to those agencies is a purely legal question. JA 57, Doc. 6, at 39. "As primarily legal questions, such challenges tend to present questions fit for judicial review." *Iowa League*, 711 F.3d at 867.

To be sure, the question whether the Working Group acted arbitrarily and capriciously in formulating the Interim Estimates, JA 59, Doc. 6, at 41, requires examining the administrative record before the Working Group and the Working Group's decisionmaking process. *Id.* But this claim is plainly not one that would "benefit from further factual development," precisely because it focuses solely in the

43

*Working Group's* decisionmaking process. *See id.* A future agency proceeding that is bound by the Working Group's Interim Values will add nothing to the question whether the *Working Group* acted arbitrarily and capriciously when it adopted the Interim Values on February 26, 2021. That question will be resolved solely on the basis of Working Group's administrative record and the Working Group's decisionmaking process. Thus, like Plaintiffs' purely legal claims, this claim involves a "quite concrete" dispute that "do[es] not implicate contingent factual circumstances." *Iowa League of Cities*, 711 F.3d at 867, 868.

In coming to the opposite conclusion, the district court relied heavily on *Ohio Forestry Association, Inc. v. Sierra Club*, 523 U.S. 726 (1998), but that case supports Plaintiffs here. *Ohio Forestry Association* involved a challenge to the Forest Service's logging plan for a national forest that did "not itself authorize the cutting of any trees." 523 U.S. at 729. Thus, there was "considerable legal distance between the adoption of the Plan and the moment when a tree is cut." *Id.* at 730. The Court concluded that it "would benefit from further factual development of the issues presented," *id.* at 733, because the validity and application of the Forest Service's Plan plainly hinged on the Forest Service's future refinement and application of the Plan. *Id.* The Supreme Court emphasized that the Forest Service might well "refine its policies" before any application of them, either "through revision of the Plan" or "through application of the Plan in practice." *Id.* at 735. Here, there is no such

44

prospect that federal agencies will "refine" the Interim Values in future proceedings, because the Values are binding on the agencies. Here, Plaintiffs' claims exclusively address the validity of actions taken by the *Working Group*, not the as-yet-incomplete actions taken by agencies bound by the Working Group's determinations. Because the Working Group's actions in promulgating the Interim Values are complete, Plaintiffs' claims "can never get riper." *Ohio Forestry Ass'n*, 523 U.S. at 737.

### 2. Delaying resolution inflicts hardship on the States.

The district court also held that "[w]ithholding the Court's consideration at present will not cause Plaintiffs significant hardship." Add. A25, JA 529. This is incorrect. Withholding the Court's consideration will plainly inflict hardship on the States by depriving them of any meaningful opportunity to comment on the Interim Values. The Working Group did not let them do so, and future agencies, even as they accept Plaintiffs' comments, will ultimately be bound by the Working Group's values. This is quintessential hardship, far more than the "minimal" showing required. *Iowa League of Cities*, 711 F.3d at 867; *see also Kennett*, 887 F.3d at 433 ("delaying review of certainly impending regulatory burdens can cause harm").

The district court opined that "Plaintiffs' speculation that their objections will be 'disregarded' or 'receive no meaningful consideration is … not supported by well-pled facts." Add. A26–27, JA 530–531. But the district court cited nothing to

45

support this conclusion, and it ignores the *legally binding* nature of the Interim Values. *See supra*, Part I.A. It is not "speculation" to anticipate that federal agencies will treat the Interim Values as authoritative and binding when the President has directed them to do so and DOJ has affirmed that they are "binding." JA 276, Doc. 28, at 36.

Again, *Ohio Forestry Association* strongly supports the States' position here. *Ohio Forestry Association* emphasized that "hardship" exists where the challenged policy "create[s] adverse effects of a strictly legal kind, that is, effects of a sort that traditionally would have qualified as harm." 523 U.S. at 733. Here, many such "adverse effects of a strictly legal kind," *id.*, are discussed above—including the fact that EO 13990 directly commandeers the States' agencies to employ the Interim Values in their administration of cooperative-federalism programs, which the district court wholly disregarded. Again, *Ohio Forestry Association* stated that "hardship" would exist when the challenged policy "command[s] anyone to do anything or to refrain from doing anything," or "create[s] … legal rights or obligations." *Id.* The Interim Values do both—they "command" federal agencies (and cooperating state agencies) to use the Interim Values, and they "create" the "legal … obligation[]" for such agencies to do so. *Id.* Likewise, the States have "pointed to [a] way in which the [Interim Values] could now force [them] to modify [their] behavior," *id.* at 734, because they purport to "force" state agencies to employ the Interim Values in

46

performing NEPA assessments, formulating State Implementation Plans, and conducting other cooperative-federalism tasks.

In the end, the "hardship" prong goes to the heart of the legal and constitutional problems with the Interim Values. They reflect a policy decision with enormous practical consequences for every foundational sector of the American economy. The Government has sought to shield this policy decision from direct political and judicial accountability by removing from the individual federal agencies who actually have delegated authority in these areas, issue it without any notice-and-comment, and then claim that it is fully insulated from judicial review. The Interim Values seek to evade meaningful notice-and-comment review and judicial scrutiny of their unconstitutional and wildly speculative character. The district court's decision insulating them from judicial review at this stage inflicts "hardship" of the very first order.

## II. The Court Should Remand With Instructions to Enter a Preliminary Injunction.

Once Plaintiffs' standing is established, this is not a close case. The Working Group plainly violated the APA by issuing the Interim Values without notice-and-comment. And the President's attempt to dictate binding numerical values for all federal agencies on a question of enormous policy importance usurps legislative power never delegated to the President, and thus violates the separation of powers. Given the critical importance of these issues and the fact that agency proceedings

47

involving the Interim Values are ongoing, the Court should remand with instructions for the district court to enter a preliminary injunction preventing those agencies from employing the Interim Values as binding in any rulemaking or other regulatory proceeding.

Where, as here, "the merits comprise a purely legal issue, reviewable de novo on appeal and susceptible of determination without additional factfinding, a remand ordinarily will serve no useful purpose." *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (quotation omitted). "Here, resolution on the merits depends primarily on the purely legal issue[s]," and "the timing of this appeal makes it impractical to remand to the district court to decide the merits in the first instance," *id.*, because rulemakings using the Interim Values in agencies like the EPA, DOT, and FERC will be well underway—if not complete—by the time appellate review is completed. The Court, therefore, should remand with instructions to enter a preliminary injunction. *Id.*

**Standard of Review.** In doing so, the Court applies *de novo* review to the purely legal questions raised by Counts One and Three of the Amended Complaint. *Id.* In deciding whether to enter the injunction, the Court considers "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Id.*

48

(quoting *Dataphase Sys., Inc. v. C L Sys. Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). "While 'no single factor is determinative,' the probability of success factor is the most significant." *Id.* (citation omitted). All factors favor the States.

A.    **Plaintiffs Are Likely to Succeed on Their Procedural APA Claim.**

The States are likely to succeed on their procedural APA claim in Count Three. The Government does not dispute that the Working Group never provided notice-and-comment of any kind before promulgating the Interim Values. The only question, therefore, is whether the Working Group is subject to the APA's rulemaking procedures. This is not a close question.

***The Working Group is an "agency."*** First, because it has the authority to make *binding* determinations on a critical policy question to other federal agencies, the Working Group is an "agency" under the APA. "Under the APA, an agency is any 'authority of the Government of the United States, whether or not it is within or subject to review by another agency.'" *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971) (quoting 5 U.S.C. § 551(1)). The APA "confers agency status on any administrative unit with *substantial independent authority* in the exercise of specific functions." *Id.* (emphasis added). *Soucie* concluded that the Office of Science and Technology was an "agency" because it had the authority to "evaluate the scientific research programs of the various federal agencies," *id.*, thus exercising some of Congress's "broad power of inquiry," *id.* at 1075. Here, the Working Group can go

49

much farther than merely "evaluating" other agencies—it can dictate their conclusion on a policy question of enormous practical significance.

The fact that the Working Group can issue legally binding directives to other federal agencies decisively confirms its agency status. That power was critical to the D.C. Circuit's reasoning in *Meyer v. Bush*, 981 F.2d 1288, 1292 (D.C. Cir. 1993), on which the Government relied heavily below. *Meyer* held that an agency exercises "substantial independent authority" when it can "act directly and independently beyond advising and assisting the President." *Id.* Critically, *Meyer* reasoned, an agency like CEQ that had "the power … to issue guidelines to [other] federal agencies," and "the authority to promulgate regulations—*legally binding* on the agencies—implementing the procedural provisions of the National Environmental Policy Act," was plainly an APA "agency." *Id.* (emphasis added). The "power to issue formal, legally authoritative commands to entities or persons within or outside the executive branch" confirms that the creature is an "agency." And that is exactly what the Working Group possesses here.

***The Interim Values are a "final agency action."*** Likewise, because the Interim Values are purportedly binding on federal agencies, they also constitute a "final" agency action. "As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or

50

interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 177-78 (citations omitted). Here, the first prong is met because the Interim Values are not "tentative or interlocutory"—they are the official values that must apply to regulatory actions until the "final" values of promulgated in January 2022. And "the second [prong] is met because, as we have discussed above, the [Interim Values] alter the legal regime to which the action agency is subject," *id.* at 178, by requiring agencies to exercise their discretion in a specific manner on an important question of legislative policy.

*The Interim Values are not an "interpretative rule."* Because they dictate specific numerical values on a substantive policy question, the Interim Values are not an "interpretative rule" or "general statement of policy" that would be exempt from notice-and-comment. 5 U.S.C. § 553(b)(A). "A rule that turns on a number" is legislative, not interpretative, unless the number follows clearly and inevitably, by a simple exercise of arithmetic, from the rule or statute. *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 170 (7th Cir. 1996). "[W]hen an agency wants to state a principle 'in numerical terms,' terms that cannot be derived from a particular record, *the agency is legislating and should act through rulemaking*." *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 495 (D.C. Cir. 2010) (quoting Henry J. Friendly, *Watchman, What of the Night?*, *in* BENCHMARKS 144-45 (1967)) (emphasis

51

added).  Here, calculating the Interim Values was not a simple exercise in arithmetic, but involved "different policy or value judgments," and "highly contested and exceedingly difficult questions of science, economics, ethics, and law."  JA 94, 104, Doc. 6-2, at 17, 27.  This was legislation, pure and simple.

Because the Interim Values are a final rule of an agency subject to the APA, the Working Group was required to provide notice-and-comment procedures.  Indeed, Section 5(b)(iii) of EO 13990 concedes this point by instructing that "[i]n carrying out its activities, the Working Group shall … solicit public comment [and] engage with the public and stakeholders."  JA 73, Doc. 6-1, at 6.  The Working Group never did so.

**B.**   **Plaintiffs Are Likely to Succeed on Their Separation-of-Powers Claim.**

The Government agrees that the Working Group possesses *no delegation of any legislative authority*: "No statute establishes it, nor delegates it any legislative authority."  JA 294, Doc. 28, at 41.  But the task of dictating *binding* values for the "social cost" of greenhouse gases is a quintessential legislative action.  When the Working Group promulgates binding "numerical" values for such social costs, "terms that cannot be derived from a particular record, *the agency is legislating*…." *Catholic Health Initiatives*, 617 F.3d at 495 (emphasis added).  When the President directed the Working Group to "legislat[e]," *id.*, yet "[n]o statute … delegates it any legislative authority," JA 294, Doc. 28, at 41, the President violated the separation

52

of powers by usurping Congress's legislative authority without a statutory delegation. The violation of separation of powers here is clear and manifest: "[T]his wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).

Article I, Section 1 of the Constitution vests the legislative power exclusively in Congress: "All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. CONST. art. I, § 1. The vesting clauses reflect the Founders' insights that "the legislative, executive, and judiciary departments ought to be separate and distinct," and that this separation is an "essential precaution in favor of liberty." THE FEDERALIST NO. 47 (Madison) (C. Rossiter ed. 1961), p. 301. "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, selfappointed, or elective, may justly be pronounced the very definition of tyranny." *Id.* The Constitution "entrust[s] the law making power to the Congress alone in both good and bad times." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 589 (1952).

"The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Id.* at 585. Here, the Working Group's power to issue the Interim Values does not "stem … from an act of Congress," because the Government admits that "no statute … delegates [the

53

Working Group] any legislative authority."  JA 294, Doc. 28, at 41.  No provision in Article II assigns this legislative task to the Executive Branch, and the Government has never cited one.

For a separation-of-powers claim, Plaintiff States need only show that a violation has occurred and their harm flows from it.  *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2196 (2020).  They have done so here.

### C. The Other Equitable Factors Favor an Injunction.

The other three equitable factors strongly favor an injunction.  *Carson*, 978 F.3d at 1059.  The States face numerous irreparable injuries to their sovereign, quasi-sovereign, and proprietary interests if the Interim Values are allowed to proceed. *Supra*, Part I.A.  The Government, by contrast, will suffer no cognizable injury from an order that prevents it from continuing to violate the Constitution and the APA. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (holding that "[t]he public has no interest in enforcing an unconstitutional" policy).

And the public interest decisively favors upholding both the APA and the separation of powers.  The separation of powers is the most fundamental principle of our constitutional order, and the most important bastion of individual liberty.  "No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty," than the fact that the separation of powers is our most vital protection of liberty.  THE FEDERALIST NO. 47, *supra*.  The Working

54

Appellate Case: 21-3013     Page: 62     Date Filed: 12/03/2021 Entry ID: 5104488

Group's "promulgation of rules without valid statutory authority implicates core notions of the separation of powers, and [courts] are required by Congress to set these regulations aside." *U.S. ex rel. O'Keefe v. McDonnell Douglas Corp.*, 132 F.3d 1252, 1257 (8th Cir. 1998).

## CONCLUSION

Plaintiffs-Appellants respectfully request that this Court reverse the district court's judgment and remand with instructions to enter a preliminary injunction preventing federal agencies from using the Interim Values as binding authority in agency actions.

Dated: December 2, 2021                    Respectfully submitted,

<div style="margin-left:40%">

**ERIC S. SCHMITT**
*Attorney General of Missouri*

/s/ *D. John Sauer*
D. John Sauer, MO 58721
  Solicitor General
Jeff P. Johnson, MO 73249
  Deputy Solicitor General

*Attorneys for Plaintiffs-Appellants*

</div>

**TREG R. TAYLOR**                          **MARK BRNOVICH**
**Attorney General of Alaska**              **Attorney General of Arizona**
Ronald W. Opsahl                            Robert J. Makar
Assistant Attorney General                  Assistant Attorney General
Alaska Department of Law                    2005 N. Central Avenue
1031 West Fourth Avenue, Suite 200          Phoenix, Arizona 85004

Anchorage, Alaska 99501
Ph: (907) 269-5100
F: (907) 276-3697
Email: ron.opsahl@alaska.gov
*Counsel for the State of Alaska*

Ph: (602) 542-5205
Robert.Makar@azag.gov
*Counsel for the State of Arizona*

**LESLIE RUTLEDGE**
**Attorney General of Arkansas**
Nicholas J. Bronni
  Solicitor General
Dylan L. Jacobs
  Assistant Solicitor General
Office of Arkansas Attorney
General Leslie Rutledge
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Ph: (501) 682-6302
Nicholas.bronni@arkansasag.gov
*Counsel for the State of Arkansas*

**THEODORE E. ROKITA**
**Attorney General of Indiana**
Tom Fisher
Solicitor General
Kian Hudson
Deputy Solicitor General
Office of Attorney General Todd
Rokita
302 West Washington Street
IGCS-5th Floor
Indianapolis, IN 46204
Ph: (317) 232-0709
F: (317) 232-7979
kian.hudson@atg.in.gov
*Counsel for the State of Indiana*

**DEREK SCHMIDT**
**Attorney General of Kansas**
Jerry Edwards
Assistant Solicitor General
Office of Kansas Attorney General
Derek Schmidt
120 SW 10th Avenue, 3rd Floor
Topeka, KS 66612-1597
Ph: (785) 368-8435 Phone
F: (785) 291-3767 Fax
Jerry.Edwards@ag.ks.gov
*Counsel for the State of Kansas*

**AUSTIN KNUDSEN**
**Attorney General of Montana**
David M.S. Dewhirst*
  Solicitor General
Montana Attorney General's Office

215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Ph: (406) 444-4145
david.dewhirst@mt.gov
*Counsel for the State of Montana*

56

**DOUGLAS J. PETERSON**
**Attorney General of Nebraska**
James A. Campbell
  Solicitor General
Justin D. Lavene
  Assistant Attorney General
Office of the Nebraska Attorney
General
2115 State Capitol
Lincoln, NE 68509
Ph:  (402) 471-2682
jim.campbell@nebraska.gov
*Counsel for the State of Nebraska*

**DAVE YOST**
**Attorney General of Ohio**
Benjamin M. Flowers
Ohio Solicitor General
30 E. Broad St., 17th Fl.
Columbus, Ohio 43215
Ph:  (614) 466-8980

bflowers@ohioattorneygeneral.gov
*Counsel for the State of Ohio*

**JOHN O'CONNOR**
**Attorney General of Oklahoma**
Mithun Mansinghani
  Solicitor General
Bryan Cleveland
  Assistant Solicitor General
Oklahoma Office of Attorney General
313 N.E. 21ST Street
Oklahoma City, OK 73105
Ph:  (405) 522-4392
mithun.mansinghani@oag.ok.gov
*Counsel for the State of Oklahoma*

**ALAN WILSON**
**Attorney General of South Carolina**
J. Emory Smith, Jr.
Deputy Solicitor General
Office of the Attorney General
PO Box 11549
Columbia South Carolina 29211
Ph.:  (803)734-3680
F:  (803) 734-3677
esmith@scag.gov
*Counsel for the State of South Carolina*

**HERBERT SLATERY III**
**Attorney General of Tennessee**
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
Phone: (615) 532-2580
*Counsel for the State of Tennessee*

**SEAN D. REYES**
**Attorney General of Utah**
Melissa A. Holyoak
  Solicitor General
Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320

Appellate Case: 21-3013     Page: 65     Date Filed: 12/03/2021 Entry ID: 5104488

Salt Lake City, UT 84114-2320
385.271.2484
melissaholyoak@agutah.gov
*Counsel for the State of Utah*

58

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this brief complies with the typeface and formatting requirements of Fed. R. App. P. 32, that it is written in Times New Word 14-point font, and that it contains 12,940 words as determined by the word-count feature of Microsoft Word. Both the brief and addendum have been scanned for viruses and are virus-free.

*/s/ D. John Sauer*

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ D. John Sauer*

Appellate Case: 21-3013    Page: 67    Date Filed: 12/03/2021 Entry ID: 5104488